UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID A. WILLIAMS,

    Plaintiff

v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

Civil Action No.  15-13375

HON. LINDA V. PARKER
U.S. District Judge
HON. R. STEVEN WHALEN
U.S. Magistrate Judge

_____/

## REPORT AND RECOMMENDATION

Plaintiff David A. Williams ("Plaintiff") brings this action under 42 U.S.C. § 405(g) challenging a final decision of Defendant Commissioner denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Docket #21] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #16] be DENIED.

## PROCEDURAL HISTORY

On May 23, 2012, Plaintiff filed applications for DIB and SSI, alleging an onset of disability date of April 25, 2011 (Tr. 156-162, 163-167).  After the initial denial of the claim, Plaintiff filed a request for an administrative hearing, held on January 15, 2014 in Cleveland,

Ohio before Administrative Law Judge ("ALJ") Susan Giuffre (Tr. 34).  Plaintiff, represented by attorney Edward Icove, testified (Tr. 13, 38-50), as did Vocational Expert ("VE") Mark Anderson (Tr. )(50-56).  On March 21, 2014, ALJ Giuffre found Plaintiff not disabled (Tr. 13-24).  On August 11, 2016, the Appeals Council denied review (Tr. 1-5).  Plaintiff filed for judicial review of the final decision in this Court on September 25, 2015.

## BACKGROUND FACTS

Plaintiff, born October 24, 1959, was 54 when ALJ Giuffre issued her decision (Tr. 24, 156).  He received a GED and worked previously as a housekeeper/floor tech, injection molder/press operator, and machine operator (Tr. 190).  His application for benefits states that he is disabled as a result of depression, hip problems, back problems, and thyroid problems (Tr. 189).

### A.  Plaintiff's Testimony

*Plaintiff's counsel prefaced his client's testimony by amending the alleged onset of disability date to April 24, 2012, the date of Plaintiff's release from prison* (Tr. 38).

Plaintiff then offered the following testimony:

His post-GED education was limited to two community college courses and heavy equipment operator training through Job Corps (Tr. 39).  He did not finish the heavy equipment operator training (Tr. 39).  He last worked as a machine operator (Tr. 40).  Prior to that position, he worked part-time as a dishwasher and as an injection mold operator, adding that he kept the mold operator position for less than 90 days (Tr. 40).  He also worked as a housekeeper/floor tech at a nursing home (Tr. 41).  He currently lived with his sister and brother-in-law (Tr. 41-42).

Plaintiff did not perform household or cooking chores (Tr. 42-43).  He was unable to drive long distances but could drive to the grocery store or other nearby locations (Tr. 43).

He spent his days alternating between sitting and walking, adding that prolonged sitting made his legs swell (Tr. 43). He was unable to stand for more than 20 minutes at one time and experienced gradually worsening eyesight (Tr. 44). He did not attend social gatherings, noting that the furthest he walked was to his father's house across the street (Tr. 45). He spent approximately half of his waking hours with his feet elevated (Tr. 45). He had been referred to an orthopedic surgeon for knee problems brought on by obesity (Tr. 46). His weight had fluctuated mostly upward due to his thyroid condition (Tr. 47). He currently stood 5' 10" and weighed 331 pounds (Tr. 47).

Plaintiff took Depakote, Wellbutrin, Ambien, and Risperidone for his "emotional problems" (Tr. 47). He experienced chronic lower back pain (Tr. 47). He currently took Celebrex and Flexeril for the back condition (Tr. 48). His social activity was limited to interacting with his sister, brother-in-law, and father (Tr. 48). He experienced work-related problems in the past due to being short-tempered (Tr. 49). He admitted that the previous summer, he chased the boyfriend of a neighbor with a baseball bat (Tr. 49). He contemplated suicide two to three times a week due to intense pain (Tr. 50).

     **B.**    **Medical Evidence**

          **1.**    **Records Related to Plaintiff's Treatment**

May, 2011 prison intake records note a history of back pain, obesity, and depression (Tr. 362). In June, 2011, Plaintiff reported stiff knees (Tr. 329). Plaintiff admitted to a past history of violent behavior but exhibited an appropriate mood and affect (Tr. 359, 563). He admitted to prior elicit drug use (Tr. 572). July, 2011 prison records note a January, 2006 MRI of the lumbar spine showing "moderate to severe bilateral foraminal stenosis at L4-L5 and L5-S1 (Tr. 244, 428-429). Plaintiff reported continuing lower back and hip pain (Tr. 327). He was assigned to a food service position (Tr. 506). The following month, he

received a left knee sleeve and was assigned a low bunk (Tr. 267, 286, 325, 432, 526). September treating records state that Plaintiff was not compliant with dietary recommendations (Tr. 296). October, 2011 medical records note a normal gait (Tr. 290). A chest x-ray was unremarkable (Tr. 354). November, 2011 records indicate that Plaintiff did not experience physical restrictions (Tr. 316). In December, 2011, he was advised to perform back exercises (Tr. 262). He was prescribed Motrin 600 (Tr. 262). Pedal pulses were deemed strong (Tr. 336).

In January, 2012, Plaintiff requested a back support because of his prison job as a porter (Tr. 311, 450). February, 2012 records state that Plaintiff experienced renewed lower back pain (Tr. 309, 311). He exhibited a normal gait (Tr. 334). Notes from the following month note full muscle strength (Tr. 333). April, 2012 records state that Plaintiff experienced renewed hip and low back pain (Tr. 303). The treating source found "no restrictions on activity" (Tr. 304). Records from the same month note a steady gait and the ability to rise from a sitting position without help (Tr. 331). Prison records note a varying mood with "goal directed" and logical thought process and an intact memory (Tr. 539). Plaintiff denied suicidal ideation or behavior (Tr. 539). He reported that he was "still grieving" over the deaths of his sister, uncle, and son-in-law (Tr. 539).

An April 23, 2012 medical summary created on the day prior to Plaintiff's release from prison notes the conditions of depression, hypothyroidism, back pain, and suspected glaucoma (Tr. 243). The summary states that Plaintiff was currently taking Prozac, Trazadone, Zocor, and Relafen (Tr. 243).

July, 2012 records by Cleveland Clinic staff note Plaintiff's report of increasing depression and ankle, knee, and foot swelling due to increased salt intake which was improved with reduced salt intake (Tr. 634, 639-640). The following month, Plaintiff sought

psychiatric counseling (Tr. 646).

In September, 2012, Plaintiff was referred for physical therapy (Tr. 630). Physical therapy records note the possible condition of "disc derangement" (Tr. 596). Physical therapy records from the following month note Plaintiff's report that he was "doing better" (Tr. 599). He was able to walk for 10 minutes at the rate of two miles per hour (Tr. 601). The following month, he denied back pain (Tr. 604). October, 2012 psychiatric intake records state that he had become depressed after "multiple deaths in his family and going to prison" (Tr. 650). He also reported anxiety (Tr. 651). He was diagnosed with major depression and assigned a GAF of 51[1] (Tr. 653). Subsequent treatment notes state that he was well groomed with a normal affect (Tr. 656). At the end of the same month, Plaintiff reported a mood improvement (Tr. 660). He was encouraged to develop regular sleeping habits (Tr. 662). The following month, Plaintiff reported that he had applied for a job at an automotive plant (Tr. 665). He exhibited a normal mood and a steady gait (Tr. 667). The following month, Plaintiff reported that Larix reduced lower extremity swelling (Tr. 691).

January, 2013 psychiatric records note Plaintiff's report that he felt "mellow and even [keeled]" (Tr. 675). He expressed discouragement that he had not been able to find a job (Tr. 677). Plaintiff was advised to use an employment service or obtain new job skills (Tr. 677). In February, 2013, Plaintiff reported that his mood had been "ok" with "some days better than others" (Tr. 625). Psychiatric counseling notes state that he was "cooperative, smiling, laughing" and making good eye contact (Tr. 684). The following month, x-rays of the cervical spine showed mild disc space narrowing (Tr. 748). April, 2013 counseling records

---

[1] A Global Assessment of Functioning ("GAF") score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-TR*"), 34 (4th ed.2000).

state that Plaintiff continued to experience problems sleeping (Tr. 740). June, 2013 counseling records note an appropriate affect and mood (Tr. 734). Counseling notes from the following month were wholly unremarkable (Tr. 732). Plaintiff stated that he would be contacting an employment service (Tr. 730). The same month, imaging studies of the cervical spine showed mild disc space narrowing (Tr. 748, 752). Imaging studies of the bilateral shoulders were unremarkable (Tr. 763, 768).

August, 2013 counseling records state that Plaintiff made unspecified threats of violence if provoked and later, threatened to "light . . . up" the counseling center if he did not receive inpatient treatment (Tr. 723-727). He was admitted for "agitation and homicidal ideation" (Tr. 822). He tested positive for Phencyclidine ("PCP") (Tr. 830, 833, 844). He exhibited moderate to severe cognitive limitations with severe to extreme limitation in impulse control and assertiveness (Tr. 858-859). He was assigned a GAF of 31-40[2] (Tr. 835). Treatment records note that he proposed to another patient that they leave the facility to "do drugs" (Tr. 863). He was discharged from inpatient treatment after a three-day stay when his behavior was deemed "under control" (Tr. 720, 861).

Counseling notes from the next month state that Plaintiff was depressed with "fair" judgment but normal memory (Tr. 714). He was assigned a GAF of 50[3] (Tr. 714). He noted that he would "prefer[] to be working" (Tr. 714). October, 2013 records state that Plaintiff had been "totally non-compliant" with diabetes treatment (Tr. 777). November, 2013 records

---

[2]A GAF score of 31–40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *DSM–IV–TR* at 34.

[3]A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *DSM–IV–TR* at 34.

state that Plaintiff was out of town for two weeks (Tr. 706).

October, 2013 treating records note Plaintiff's report of neck pain and frequent urination (Tr. 699). Treating records note that Plaintiff tested positive for "PCP and amphetamines" (Tr. 813).

### 2. Non-Treating Records

In June, 2012 Mitchell Wax, Ph.D. performed a psychological examination on behalf of the SSA, noting Plaintiff's history of school suspensions for "fighting and disobedience" and multiple arrests (Tr. 583). Plaintiff reported that since leaving prison two months earlier, he had established a new romantic relationship (Tr. 583). He relied on food stamps and monetary support from an ex-girlfriend (Tr. 583). He reported the physical conditions of arthritis resulting in back, knee, and right hip pain (Tr. 583). Plaintiff currently took Prozac and Trazodone (Tr. 583). He denied difficulty with former supervisors or coworkers (Tr. 584). He read the paper regularly, watched television for about six hours a day, and visited with friends on a daily basis (Tr. 584).

Dr. Wax noted that Plaintiff had last had psychiatric care in 2011 but was not in counseling (Tr. 583). He noted possible alcohol abuse (Tr. 583). He observed that while Plaintiff "initially presented with an 'attitude,'" expressed annoyance, and gave "intentionally vague and circumstantial" answers, he later "soften[ed] and became appropriate" (Tr. 584). Plaintiff was able to drive himself to the appointment and was dressed appropriately (Tr. 584). He reported that he currently weighed around 300 pounds (Tr. 585). While Plaintiff reported weekly panic attacks, Dr. Wax noted that "[n]o diagnosis of panic disorder" could be made on the basis of Plaintiff's report (Tr. 585). Dr. Wax noted that Plaintiff's intelligence was in the average range but noted a possible learning disorder (Tr. 585).

Dr. Wax assigned a GAF of 61, noting that although Plaintiff was recently released

from prison, he was able to sustain romantic relationships, visit friends, and look for a job[4] (Tr. 586). Dr. Wax found "no difficulty understanding and carrying out instructions" (Tr. 586). He concluded that Plaintiff was "looking for work and would be able to respond appropriately to work pressures in a work setting" (Tr. 587). The following month, Mel Zwissler, Ph.D. conducted a non-examining assessment on behalf of the SSA, finding that Plaintiff experienced mild limitation in activities of daily living, moderate difficulty in social functioning, and mild limitation in concentration, persistence, or pace resulting from depression and a substance abuse disorder (Tr. 63). Dr. Zwissler noted that Plaintiff denied difficulty getting along with supervisors or coworkers in his previous jobs (Tr. 64). Gary Hinzmann conducted a non-examining review of Plaintiff's records of physical treatment, finding that Plaintiff could lift 10 pounds frequently and 20 occasionally; sit, stand, or walk for around six hours in an eight-hour workday; and push and pull without limitation (Tr. 65). He found no other limitations (Tr. 65).

In November, 2012 Edward Butler, M.D. performed a consultative physical examination, noting Plaintiff's report of level "7" to "10"out of 10 back pain (Tr. 609). He also reported bilateral knee pain (Tr. 609). Dr. Butler noted that the imaging studies of the knees were unremarkable and that Plaintiff's hypothyroidism was well controlled with medication (Tr. 609-610). He noted a diagnosis of borderline glaucoma (Tr. 610). Plaintiff reported that he cooked daily, cleaned once or twice a week, and shopped as needed (Tr. 610).

Dr. Butler noted "a slightly antalgic gait on the right side" but that Plaintiff was able to squat, arise from a sitting position, and heel and toe walk without difficulty (Tr. 611).

---

[4]GAF scores in the range of 61-70 indicate "some mild [psychological] symptoms or some difficulty in social, occupational, or school functioning." *DSM–IV–TR* at 34.

Plaintiff appeared fully oriented with good eye contact (Tr. 612). Dr. Butler found mild limitations in pushing, pulling, lifting, and climbing (Tr. 613, 615-618).

The same month, Roseann Umana, Ph.D. performed a non-examining psychological assessment, finding that Plaintiff experienced mild limitation in activities of daily living, moderate limitation in social functioning, and mild limitation in concentration, persistence, and pace (Tr. 78-79). She found that Plaintiff was moderately limited in the ability to interact with the public, supervisors, and coworkers (Tr. 82). In January, 2013, Theresita Cruz, M.D. performed a non-examining assessment of Plaintiff's physical limitations, finding that he could lift 50 pounds occasionally and 25 frequently; sit, stand, or walk for around six hours in an eight-hour workday; and push and pull without limitation (Tr. 95-96). Dr. Cruz found that Plaintiff was capable of frequent stooping, kneeling, crawling, and crouching; unlimited balancing and climbing of stairs and ramps; and occasional climbing of ladders, ropes, and scaffolds (Tr. 96). Dr. Cruz found no other physical limitations (Tr. 96).

 **C. Vocational Expert Testimony**

Citing the *Dictionary of Occupational Titles*, ("*DOT*"), VE Mark Anderson classified Plaintiff's former housekeeping/floor tech position as exertionally medium (heavy as performed by Plaintiff) and unskilled, and work as a machine operator, medium/semiskilled[5] (Tr. 51-52). He testified that the machine operator position did not have transferable skills (Tr. 52). The ALJ then posed the following question, describing a hypothetical individual of Plaintiff's age, educational level, and past relevant work:

 [Consider a person . . . with the capacity for medium work who could never

---

[5] Pursuant to the *DOT*, the VE also testified that the brief work as an injection mold press operator was exertionally medium and skilled, adding that because Plaintiff performed the job for less than 90 days, it was unlikely that the work could be classified as skilled (Tr. 51-52). The ALJ "struck" the injection molding testimony (Tr. 52).

> climb ladders, ropes, or scaffolds; who could frequently stoop, kneel, crouch, crawl; who has the capacity for superficial interaction with others; and the capacity to perform work which does not require persuading others (Tr. 53).

The VE testified that the individual could perform Plaintiff's former work as a housekeeper/floor technician as described by the DOT but not as actually performed (at the heavy exertional level) (Tr. 53). The VE stated further that Plaintiff could perform the machine operator position as described by the DOT and as actually performed (Tr. 53-54).

In response to questioning by Plaintiff's counsel, the VE stated that the need to elevate the legs for up to a third of the day would preclude all of the past relevant work (Tr. 54). He found that the need for leg elevation beyond 18 inches would preclude all "un-accommodated" work (Tr. 55). The VE testified that if the hypothetical limitations posed by the ALJ were amended to preclude all dealings with "supervisors, coworkers, or the public," all of the former work and all unskilled work would be eliminated (Tr. 56).

### D. The ALJ's Decision (June 11, 2014)

Citing the medical records, ALJ Giuffre found that Plaintiff experienced the severe impairments of "foraminal stenosis of the lumbar spine, cervical strain, obesity, affective disorder, and substance addiction disorder" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 15, 18). The ALJ determined that Plaintiff experienced mild limitation in activities of daily living, moderate limitation in social functioning, and mild limitation in concentration, persistence, or pace (Tr. 17-18). The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform medium work with the following additional restrictions:

> [N]o climbing ladders/ropes/scaffolds, frequent stooping, kneeling, crouching, or crawling, is limited to superficial interaction with others, and has the capacity to perform work which does not require persuading others (Tr. 19).

Citing the VE's testimony, the ALJ found that Plaintiff could perform his past relevant work

as a house cleaner/floor technician and machine operator as the positions were generally performed in the national economy (Tr. 23).

The ALJ discounted Plaintiff's allegations of disability, noting that the January, 2006 MRI of the lumbar spine did not show nerve root impingement (Tr. 20). She cited prison records showing "a steady gait, full range of motion, and intact muscle strength" (Tr. 20). She noted Plaintiff's report that he was pain free with medication (Tr. 20). She cited treating records showing that the lower extremity edema was improved with medication (Tr. 20). She noted that while October, 2012 mental health intake records show depression, January, 2013 psychiatric records showed an "ok" mood (Tr. 21). She observed that Plaintiff's August, 2013 inpatient treatment records showed PCP and amphetamine use (Tr. 21). She accorded "great weight" to Dr. Cruz's January, 2013 finding that Plaintiff could perform a significant range of medium work, but found that due to "obesity and safety concerns," Plaintiff was precluded from all use of ladders, ropes, or scaffolds" (Tr. 22).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into

account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes three arguments for remand. First, he contends that in crafting the RFC for exertionally medium work, the ALJ did not adequately consider limitations caused by obesity. *Plaintiff's Brief,* 7-8, *Docket #16.* Second, Plaintiff argues, in effect, that his problems interacting with others precludes all work. *Id.* at 8-9. He criticizes the ALJ's

reliance on Dr. Wax's June, 2012 and Dr. Zwissler's opinions on the basis that the subsequently created evidence shows a greater degree of psychological limitation. *Id.* For the same reasons, he takes issue with the ALJ's adoption of Dr. Cruz's January, 2013 conclusion that he could perform medium work. *Id.* at 9-10. Third, he contends that the finding that he could perform his past relevant work as a machine operator and housecleaner/floor tech was not well supported or articulated.

### A. Obesity

Plaintiff is correct that in the instance a claimant is found to be obese, the Commissioner must conduct an individualized assessment of the impact of the claimant's obesity on his or her functional abilities. SSR 02–1p, 2002 WL 34686281, *3 (June 21, 2002). However, when determining the impact upon an individual's ability to function, SSR 02–1p "does not mandate a particular mode of analysis, but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Nejat v. Commissioner of Social Sec.,* 359 Fed. Appx. 574, 577, 2009 WL 4981686, *3 (6th Cir. December 22, 2009).

The ALJ did just that. First, citing SSR 02-1p, she found that the condition was a severe impairment, noting Plaintiff's weight of 316 pounds (Tr. 15-16). She stated that she considered the impact of obesity on the "ability to perform routine movement and necessary physical activity within the work environment" (Tr. 16). The ALJ acknowledged that while obesity was not a listed impairment, it could be the exclusive cause of disability, or, result in the "inability to ambulate effectively" as defined by the listings (Tr. 18). However, she noted that the record did not "document a finding" that Plaintiff was unable to ambulate effectively (Tr. 18). She cited prison records showing a steady gait on multiple occasions and 2013 treating records showing a normal gait and muscle strength (Tr. 20). She noted that

Plaintiff's stopped working in 2011 because he went to prison rather than due to a physical or mental condition (Tr. 21). Nonetheless, she found that due to obesity, Plaintiff was precluded from all climbing of ladders, ropes, and scaffolds (Tr. 22). The ALJ observed that none of the treating or examining physicians opined that Plaintiff was unable to return to work (Tr. 21). My own review of the record mirrors the ALJ's obesity analysis. As such, Plaintiff's claim that the ALJ failed to acknowledge that the condition of obesity, or, failed to explain why the condition did not result in disability, does not provide a basis for remand.

### B. The RFC

Contrary to Plaintiff's contention, substantial evidence adequately supports the finding that Plaintiff was psychologically and physically capable of a limited range of medium work. As to the psychological impairments, the ALJ cited Dr. Wax's June, 2012 observation of "logical, coherent, and goal directed" speech and a lack of anxiety (Tr. 16). She adopted Dr. Zwissler's finding of moderate difficulties in social functioning but otherwise mild psychological symptoms (Tr. 17). In support of the finding of mild limitation in daily activities and concentration, the ALJ cited Plaintiff's admitted ability to care for his elderly mother, drive, perform household chores, and shop (Tr. 17). The ALJ noted that while Plaintiff was hospitalized in August, 2013 after making threats to treating sources, his behavior was found to be attributable to PCP use (Tr. 16). She cited treatment records from the following month showing that the psychological crisis was resolved (Tr. 16, 714). The ALJ noted that the treating records contained numerous references to Plaintiff's active search for a job (Tr. 21, 665, 667, 714, 730). Accordingly, I agree that the RFC's limit to "superficial interaction with others" and the ability to "perform work which does not require persuading others" adequately addresses the moderate limitations in social function (Tr. 19).

As to the physical limitations, the ALJ adopted Dr. Cruz's January, 2013 finding that

Plaintiff was capable of medium work with frequent stooping, kneeling, crouching, and crawling, only modifying his findings to the extent that instead of occasional climbing of ladders, ropes, and scaffolds, Plaintiff was precluded from such activity due to obesity and "safety concerns" (Tr. 19, 22).

Plaintiff's argument that Drs. Wax, Zwissler, or Cruz's findings were "outdated" does not provide grounds for remand. Plaintiff is correct that in some instances, favoring older findings over more current ones may constitute reversible error. *See Hamblin v. Apfel*, 2001 WL 345798, *2 (6th Cir. March 26, 2001)(affirming ALJ's rejection of a treating physician's "outdated" opinion on the basis that the consultive physician had performed a more recent appraisal with contradicting findings). The Sixth Circuit's holding favoring the use of updated medical information is potentially more applicable when the older evidence was created by a non-treating source. *See Sayles v. Barnhart*, 2004 WL 3008739, *23 (N.D. Ill. December 27, 2004)(adoption of "outdated and inadequate" non-treating findings created prior to a diagnosis of diabetes grounds for remand).

However, in contrast here, the ALJ's reliance on the earlier evidence is not improper. While neither Dr. Wax nor Dr. Zwissler had the benefit of the August, 2013 impatient hospitalization records, Plaintiff's threats to his treating psychological sources and three-day inpatient admission appear to have been precipitated by the use of PCP. As the ALJ noted, treating records from the following month show that Plaintiff's condition stabilized after ceasing use of the illicit drug (Tr. 21). Plaintiff's reliance on *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009), in support of the argument that the ALJ automatically erred by adopting earlier records over more recent ones is without merit. *Plaintiff's Response,* 2, *Docket #25*. *Blakley* does not state that an ALJ is precluded from adopting earlier records, but rather, is required to give "some indication that the ALJ at least considered" the later-

created records before giving greater weight to the earlier ones. Applicably here, the ALJ discussed all of the records post-dating the June and July, 2012 and January, 2013 non-treating opinions (Tr. 16). Further, while Plaintiff also argues that the physical treating records post-date Dr. Cruz's January, 2013 assessment, none of the subsequent records suggest a greater degree of physical restriction. Imaging studies from the following months show only mild disc space narrowing of the cervical spine (Tr. 748, 752). Imaging studies of the bilateral shoulders were also unremarkable (Tr. 763, 768). While Plaintiff, citing *Elias v. CSS,* 2010 WL 5158871, *3 (N.D. Ohio December 14, 2010), also makes a generalized argument that the ALJ improperly took a "'smorgasbord approach'" to the medical evidence by considering only the evidence supporting non-disability, my own review indicates that the ALJ provided an accurate summation of the evidence. The ALJ did not err by finding that the transcript as a whole, including Plaintiff's multiple statements that he was actively looking for work, undermines his allegations of disability.

As such, the Court finds no error in the ALJ's adoption of Drs. Wax, Zwissler, and Cruz's opinions.

### C. The Step Four Determination

Plaintiff's two-paragraph argument that the ALJ failed to articulate the Step Four finding that he could return to his past relevant work does not provide grounds for remand.

At Step Four, a three-prong test must be met in order to find that a claimant can return to her past relevant work: "(1) a finding of fact as to the individual's RFC; (2) a finding of fact as to the physical and mental demands of the past job; and (3) a finding of fact that the individual's RFC permits a return to that past job." SSR 82–62, 1982 WL 31386, *2 (1982). The Step Four determination can be supported by the finding that claimant can perform his past relevant work as "actually performed," or, "as generally required by employers

throughout the national economy." SSR 82–61, 1982 WL 31387, *2 (1982). At Step Four of the sequential analysis, the claimant "bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work" either as previously performed or as generally required in the national economy. *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 474 (6th Cir. 2003).

As required by SSR 82–62, the ALJ crafted an RFC for a range of exertionally medium work (Tr. 19). The VE testified that the machine operator position was exertionally medium and semiskilled and the housekeeper/floor tech position was medium/unskilled (Tr 52). The VE also testified that the limitations found in the RFC (in the form of the "hypothetical" question at the hearing) would allow for the performance of the housekeeper/floor tech position as generally performed in the national economy (Tr. 23). Plaintiff's inability to do the job as previously performed does not prevent the ALJ from finding that he was not disabled because he could do it "as generally performed" in the national economy. *Jones, supra.* Even assuming that Plaintiff were unable to perform the housekeeper position, the VE also testified that the machine operating job could be done as actually performed *and* as performed in the national economy (Tr. 53). The ALJ adopted the VE's testimony that the RFC for a range of medium work would allow for the past relevant work (Tr. 23). Because the Step Four finding is well supported by substantial evidence and well articulated, a remand is not warranted on this basis.

In closing, my recommendation to uphold the Commissioner's decision should not be read to trivialize Plaintiff's personal challenges. However, because the ALJ's determination was within the "zone of choice" accorded the administrative fact-finder, it should remain undisturbed. *Mullen v. Bowen*, *supra*.

## **CONCLUSION**

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment [Docket #21] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #16] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: November 28, 2016

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on November 28, 2016, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen